THE STATE, EX REL. CUNNINGHAM, APPELLANT, *v.* INDUSTRIAL
COMMISSION OF OHIO, APPELLEE.

[Cite as State, ex rel. Cunningham, *v.* Indus. Comm. (1987),
30 Ohio St. 3d 73.]

(No. 86-440—Decided April 22, 1987.)

*Gallon, Kalniz & Iorio Co., L.P.A., James A. Whittaker* and *William R. Menacher,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, *Janet E. Jackson* and *Merl H. Wayman,* for appellee.

*Per Curiam.* The sole issue presented for review in this case is whether the Industrial Commission erred in denying relator's claim that

respondent violated IC-5-03.07(A) and (B). Cunningham urged below that Toledo Pickling had failed to comply with these provisions by failing to provide a means of disengaging the power supply of the welding machine within easy reach of the operator and by failing to provide a lock-out device for the controls or warning tags.

The Industrial Commission hearing officer found that no specific safety requirement was violated when Cunningham was injured. The hearing officer specifically determined that "claimant was not injured by, 'power transmission machinery and facilities required to transmit power to operating equipment or machine tools.' " It is this determination, which was affirmed in all respects by the Industrial Commission, which formed the basis for the mandamus action.

Appellant argues that the Industrial Commission erred when it determined that the title or heading and the first sentence of IC-5-03 limited the scope of the rules contained thereunder to "power transmission machinery." Rather, appellant contends the rules contained in IC-5-03 apply to *all* machinery, regardless of whether or not the machinery is power transmission machinery and, consequently, the specific requirement of IC-5-03.07(A) (requiring means of disengaging the power supply within easy reach of the operator) and the requirement of IC-5-03.07(B) (requiring a lock-out device or warning tags) are applicable to an arc/butt strip welder like the one used by appellant on the pickling line.

Appellant advances three arguments to support this claim. First, appellant insists that the title and first sentence of IC-5-03, which purport to limit the scope of the rule to "power transmission machinery," are merely "prefatory language" and do not constitute any part of the Industrial Commission's rule. To support this contention, appellant cites R.C. 1.01, which reads in pertinent part:

"All statutes of a permanent and general nature of the state as revised and consolidated into general provisions, titles, chapters, and sections shall be known and designated as the 'Revised Code,' for which designation 'R.C.' may be substituted. *Title, Chapter, and section headings and marginal General Code section numbers do not constitute any part of the law as contained in the 'Revised Code.'* * * *" (Emphasis added.)

Appellant asserts that R.C. 1.01 is applicable to administrative rules or it should be applicable to them by analogy, and that R.C. 1.01 requires that the Industrial Commission interpret IC-5-03 without recourse to its title or its first sentence. When read without such language, the provision that specifies that IC-5-03 applies only to "power transmission machinery" disappears, and the requirements of IC-5-03.07(A) and (B) become applicable to "all machinery."

While there is legal support for the contention that "[t]he orders of the Industrial Commission formulating rules for specific safety requirements have the effect of legislative enactments and are, therefore, subject to the ordinary rules of statutory construction," *State, ex rel. Miller Plumbing*

*Co.,* v. *Indus. Comm.* (1948), 149 Ohio St. 493, 496-497, 37 O.O. 197, 199, 79 N.E. 2d 553, 555, R.C. 1.01 is not an "ordinary rule of statutory construction." Rather, it is a law which, by its terms, applies specifically to statutes enacted as part of the Ohio Revised Code. Such statutes are arranged in the Revised Code by "title" and "chapter," and occasionally are grouped under "section headings." The Administrative Code is not so arranged.[1]

Even assuming, *arguendo,* that R.C. 1.01 applied to IC-5-03, it would only require that the "title" or "section heading," which includes the boldface words "Power Transmission Machinery," be disregarded. The first sentence of IC-5-03 repeats those exact words, however, and expressly states in unequivocal terms that "IC-5-03 applies to power-transmission machinery and facilities required to transmit power to operating equipment or machine tools." Under the principle of *expressio unius est exclusio alterius, Cincinnati* v. *Roettinger* (1922), 105 Ohio St. 145, 152, 137 N.E. 6, 8, because the rule states that it is applicable to power transmission machinery, it can be safely presumed that it does *not* apply to machinery which is not power transmission machinery. For these reasons, it is clear that appellant's argument that the limiting language of the heading and the first sentence of IC-5-03 are not "any part of" the rule is unpersuasive and was properly rejected below.

Appellant next argues that IC-5-03 is ambiguous and consequently the Industrial Commission should have employed the rules of construction codified in R.C. 1.49 to conclude that IC-5-03 applies to all machinery, not just to power transmission machinery. R.C. 1.49 provides that:

"If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters:

"(A)   The object sought to be attained;

"(B)   The circumstances under which the statute was enacted;

"(C)   The legislative history;

"(D)   The common law or former statutory provisions, including laws upon the same or similar subjects;

"(E)   The consequences of a particular construction;

"(F)   The administrative construction of the statute."

Ambiguous language is language which is susceptible to different interpretations or meanings. A word or phrase is ambiguous if it is capable of being interpreted as referring to more than one object or event. Although appellant invokes R.C. 1.49, he does so only in a cursory manner. He does not explain precisely how the words "power transmission machinery" are susceptible to different interpretations or how such words can reasonably be interpreted to include the arc/butt strip welder involved

---

[1] At present, agency rules, as compiled in the Ohio Administrative Code, are divided into "chapters" and "rules," not into titles or sections. (See 1 Ohio Adm. Code, User's Guide, at 4.)

in this case. Even assuming that the term is ambiguous, appellant fails, with one exception, to even attempt to show how the matters enumerated in R.C. 1.49 lead to the conclusion that IC-5-03 applies to all machinery.

Appellant seems to argue that the words "power transmission machinery" should be conveniently ignored on the authority of R.C. 1.49. However, the factors enumerated in R.C. 1.49 can only be used as an aid to the interpretation of the Industrial Commission rule as it was promulgated. Appellant offers no *interpretation* of the *language* of IC-5-03 which would bring a welding machine within its purview. Rather, he seeks to have a major provision of the rule ignored, as if it did not exist. This is not an attempt to construe the rule; rather, it is an attempt to rewrite it. "There is no authority under any rule of statutory construction to add to, enlarge, supply, expand, extend or improve the provisions of the statute to meet a situation not provided for." *State, ex rel. Foster,* v. *Evatt* (1944), 144 Ohio St. 65, 29 O.O. 4, 56 N.E. 2d 265, paragraph eight of the syllabus.

The only factor listed in R.C. 1.49 that appellant develops to any extent in his argument is R.C. 1.49(E): "[t]he consequences of a particular construction." He does so by means of an appeal to the rule against "absurd results." That rule of construction is set out in *State, ex rel. Haines,* v. *Rhodes* (1958), 168 Ohio St. 165, 5 O.O. 2d 467, 151 N.E. 2d 716, paragraph two of the syllabus: "The General Assembly is presumed not to intend any ridiculous or absurd results from the operation of a statute which it enacts, and, if reasonably possible to do so, statutes must be construed so as to prevent such results."

Appellant invokes this rule of construction in his attempt to do away with the initial language of IC-5-03 by pointing out absurd results which the language engenders. He mentions several inconsistencies in the various types of machinery covered in the rules grouped under IC-5-03. Although the heading and first sentence of IC-5-03 limit its applicability to power transmission machinery, there are several rules contained within IC-5-03 which are logically inconsistent with that limitation. For example, IC-5-03.04 deals with "overhead conveyors" which "carry material," and requires that guardrails and barriers be installed "to catch falling material." IC-5-03.09(D) requires that "[p]ortable electrically driven *tools* and *equipment* shall be provided with a means of grounding." (Emphasis added.) IC-5-03.10 applies to "feed rolls," or machinery which feeds materials into a machine for processing. Most importantly, the safety rules alleged to have been violated in this case, IC-5-03.07(A) and (B), speak in terms which envisage an "operator" who has "controls" which are required to be "within easy reach."

Appellant urges that requirements such as these have no applicability to power transmission machinery. Power transmission machinery does not generally "carry material" on "overhead conveyors." Nor are "portable electrically driven tools and equipment," or machinery which has "feed rolls," considered to be power transmission machinery. Finally, it can be

argued that power transmission machinery does not usually require an "operator." Because these requirements apparently apply to machinery *other than* power transmission machinery, appellant argues that the title and first sentence of IC-5-03 should be ignored and that the safety requirements contained thereunder should be read as referring to all machinery.

Appellant further attempts to bolster this argument by reference to the subsequent history of IC-5-03.07(A) and (B). Prior to August 1, 1977, the language of IC-5-03.07(A) and (B), requiring a means of disengaging the power supply within easy reach and a lock-out device, was grouped under IC-5-03, governing power transmission machinery. On August 1, 1977, the previous Code of Specific Safety Requirements was superseded by the Ohio Adm. Code Chapter 4121:1-5. In this new codification, the requirements of a disengaging switch and a lock-out device are not grouped under the rule governing "Mechanical Power Transmission Apparatus," Ohio Adm. Code 4121:1-5-04, but rather are contained in a new rule, Ohio Adm. Code 4121:1-5-05, governing "Auxiliary Equipment." This rule governs all auxiliary equipment, regardless of whether it transmits power to operating equipment. Ohio Adm. Code 4121:1-5-05(D)(1) and (2) embody the same requirements as to machinery controls as those that were contained in IC-5-03.07(A) and (B), and do so in the exact language. According to appellant, the fact that the "machinery control" requirements of IC-5-03.07(A) and (B) were relocated in 1977 under "Auxiliary Equipment" leads to the "absurd result" that different workers could sustain the same injury while working on the same type of machine and, depending on whether the machine was installed before or whether it was installed on or after August 1, 1977, one injury would form the basis of an award while the other would not.

It must be conceded that the shifting of the language of the machinery control section of IC-5-03.07(A) and (B) to a rule covering "Auxiliary Equipment" indicates a desire, on the part of the Industrial Commission, to expand the coverage of those safety requirements on and after August 1, 1977. However, a subsequent change in the rule which expands its coverage does not permit this court to give an expansive interpretation to the previous, non-expansive version of the rule. Such a result could only be achieved by ignoring the express provision contained in the version of the rule which was applicable at the time of the installation of the welding machine.

The fact that the outcomes of two similar or even identical cases which arise at different times turn out to be different because of an intervening change in the applicable law does not constitute an "absurd result," to be rectified by statutory construction. Cases arising at different times are often governed by different laws which might affect their outcomes. The mere fact that an outcome turns out to be different in similar cases because of their timing is not an "absurd result," but is rather a fact of life under our legal system.

For these reasons, we find appellant's arguments based upon the "rule against absurd results" unconvincing. Appellant's point is well-taken that some of the rules grouped under IC-5-03 deal with machinery which does not, in the strict sense of the term, "transmit power." However, appellant fails to provide this court with any plausible construction of the rule which would reconcile the apparently contradictory provisions. Instead, appellant merely asks this court to ignore the language of the rule which does not support his claims. There is no legal authority for performing such a judicial excision. On the contrary, the rule of *in pari materia* requires that individual sections of a statute or rule on the same subject should be reconciled and harmonized if at all possible. See, *e.g.*, *Trotwood Trailers, Inc.* v. *Evatt* (1943), 142 Ohio St. 197, 27 O.O. 168, 51 N.E. 2d 645, paragraph one of the syllabus.

There is a sense in which "belts and pulleys" (IC-5-03.03), "shafts and flywheels" (IC-5-03.05), and "gears, sprockets and friction drives" (IC-5-03.06) all can be conceived as being employed as a means of converting electrical energy to mechanical energy in order to move equipment or equipment parts. In that sense they can be conceived as power transmission machinery.

An arc/butt strip welder, on the other hand, shares none of the characteristics of the above machinery. It in no way transmits materials or power, and has no belts, pulleys, shafts, flywheels, gears or sprockets, or friction drives. It does have controls which are mentioned in IC-5-03.07(A) and (B), but *all* machinery has some manner of controls, and to broaden the application of IC-5-03 on that basis would be to utterly ignore the express language of both the title and first sentence of IC-5-03 and would deprive the rule of any conceptual coherence.

Based on the foregoing, we hold that the Industrial Commission's determination that the requirements of IC-5-03.07(A) and (B) were inapplicable to the arc/butt strip welder in question was supported by some evidence in the record. Consequently, no abuse of discretion occurred and the court of appeals acted properly in denying the writ of mandamus below. *State, ex rel. Ohio Precision Castings,* v. *Bohman* (1982), 69 Ohio St. 2d 391, 394, 23 O.O. 3d 356, 357-358, 432 N.E. 2d 806, 809.

The judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, LOCHER, HOLMES, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.